## REVILLON FRÈRES *v.* UNITED STATES (No. 461).[1]

PONY SKINS, DRESSED FURS ON THE SKIN.

Pony skins are not "furs" or "fur skins" in the common, ordinary meaning of those words, but the evidence seems to make it clear that for several years before the enactment of the tariff law of 1909 pony skins had been dealt in commercially precisely as true fur skins and employed as such in manufacture; they are dutiable as dressed fur skins under paragraph 439, tariff act of 1909.—United States *v.* Bennett (66 Fed. Rep., 299).

United States Court of Customs Appeals, October 12, 1911.

APPEAL from Board of United States General Appraisers G. A. 7079 (T. D. 30798).

[Affirmed.]

*B. A. Levett* for appellants.

*D. Frank Lloyd,* Assistant Attorney General (*Charles D. Lawrence* on the brief), for the United States.

Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

SMITH, Judge, delivered the opinion of the court:

This case raised the question as to the proper classification of certain "pony skins" imported into the country at the port of New York and assessed for duty by the collector as "dressed furs on the skin," at 20 per cent ad valorem under the provisions of paragraph 439 of the tariff act of August 5, 1909, which reads as follows:

439. Furs dressed on the skin, not advanced further than dyeing, but not repaired, twenty per centum ad valorem; manufactures of furs, further advanced than dressing and dyeing, when prepared for use as material, including plates, linings, and crosses, thirty-five per centum ad valorem; articles of wearing apparel of every description, partly or wholly manufactured, composed of or of which fur is the component material of chief value, fifty per centum ad valorem. Furs not on the skin, prepared for hatters' use, including fur skins carroted, twenty per centum ad valorem.

---
[1] Reported in T. D. 31948 (21 Treas. Dec., 384).

The importers protested that the goods were either dutiable at 15 per cent ad valorem under paragraph 451 or free of duty under paragraph 676, the pertinent provisions of which paragraphs are as follows:

451. * * * Kangaroo, sheep, and goat skins (including lamb and kid skins) dressed and finished, other skins and bookbinders' calfskins, all the foregoing not specifically provided for in this section, fifteen per centum ad valorem; * * *.

Free list.—That on and after the day following the passage of this act, except as otherwise specially provided for in this act, the articles mentioned in the following paragraphs shall, when imported into the United States * * * be exempt from duty:

*        *        *        *        *        *        *

676. Skins of all kinds, raw (except sheepskins with the wool on), and hides not specially provided for in this section.

The debatable issue raised by the classification of the collector and the protest of the importer is whether the pony skins so imported are furs or fur skins in fact, and if not, whether, by commercial usage and custom at and prior to the tariff act of August 5, 1909, they had come to be so regarded, treated, and understood by the trade.

The Board of General Appraisers overruled the protest, and the importers appealed.

Counsel for the appellants contend that the goods are not furs or fur skins within the ordinary meaning of those words or as known to the trade, and that therefore they should be assessed for duty as "other skins" under paragraph 451 or admitted free as "hides not specially provided for" under paragraph 676.

As defined by the standard authorities, "fur" is the short, soft, fine, curly, silky, or downy hair which covers the skin of certain animals and is protected by a straight, smooth, comparatively rigid hair intermingled with it. (Standard Dictionary; Encyclopedia Britannica, 11th ed., Vol. XI.)

The evidence shows that the pony skins are covered with the latter class of hair only, and therefore they are not "furs" or "fur skins," giving to those words their common, ordinary meaning. Whether the merchandise can be classified as "furs" or "fur skins" would seem to depend consequently on whether trade usage and custom has given to the word "fur" a broader signification than that popularly accorded to it and, failing that, on the applicability of the similitude clause.

The case appears to have been tried to some extent on the theory that the commercial meaning of "dressed furs" and of "furs dressed on the skin," and not that of "furs" or "fur skins," was the question to be solved, and as a result there were differences in statement which seemingly left several of the witnesses at variance with themselves and one another. Quite naturally most, if not all, of the

witnesses, both for the Government and for the importers, testified that pony skins were not ordered, bought, and sold as "dressed furs" or as "furs dressed on the skin." At the same time it was made perfectly clear by the testimony that no skins, whether true furs or not, were so ordered, bought, or sold. Such expressions are too indefinite for commercial transactions, and necessarily more specific language must be used by buyer and seller if the one is to understand and the other to secure what is wanted.

It seems to be established by witnesses for the Government and the importers that when fur skins, dressed fur skins, or dressed furs are referred to in the trade they are generally spoken of as "skins," or "dressed skins," which terms are considered and understood by the trade as synonymous with the longer expressions. Consequently, when ordering, buying, or selling the skins of the otter, beaver, or muskrat, which are true fur-bearing animals, they are not ordered, bought, or sold as "fur skins" or "dressed furs" or "furs dressed on the skin," or as otter, beaver, or muskrat fur skins, or as otter, beaver, or muskrat fur skins dressed, but as otter, beaver, or muskrat "skins," natural or dressed as the case may demand. Ellipsis is as much in use in the business as in the literary world, and whether an order is given for "skins" or "fur skins," "dressed skins," or "dressed fur skins," the meaning is just the same to a trade which requires for its uses only "skins" which serve the purposes of fur skins.

A careful analysis of all the testimony leaves no doubt in our minds that for the six or seven years immediately prior to the tariff act of August 5, 1909, pony skins of the class of the importation here under consideration were uniformly bought and sold in precisely the same way as were true fur skins. They were then and are now imported into the country by importers of furs, bought and sold by furriers, dressed and dyed by dressers and dyers of furs, and made up into fur garments by manufacturers of fur wearing apparel. They were then and are now definitely, uniformly, generally, and not personally, partially, or locally, treated and used by the fur trade as a fur. In the light of these facts, which we consider clearly proved by the evidence, we see no escape from the conclusion that this case is on "all fours" with United States *v.* Bennett (66 Fed. Rep., 299) and that at and prior to the passage of the tariff act of August 5, 1909, trade usage and custom had so far crystallized as to give to the term "fur skins" a definite, uniform, and general signification broader than its ordinary meaning and sufficiently comprehensive to embrace the pony skins in question.

As we are of opinion that pony skins are fur skins within the provisions of paragraph 439, the claim that they are entitled to free entry as "hides not specially provided for" can not be sustained.

The decision of the Board of General Appraisers is *affirmed.*